# EXHIBIT A

FILED
DALLAS COUNTY
3/30/2016 12:09:04 PM
FELICIA PITRE
DISTRICT CLERK

Tonya Pointer

DC-16-03674

CAUSE NO. _____

| | | |
|---|---|---|
| DEBORAH WILLIAMS, AS NEXT | § | IN THE DISTRICT COURT |
| FRIEND OF LENOIR WAREING, | § | |
| INCOMPETENT | § | |
| | § | |
| VS. | § | |
| | § | _____ JUDICIAL DISTRICT |
| SSC DALLAS OPERATING CO., LLC, | § | |
| INDIVIDUALLY AND d/b/a | § | |
| THE MEADOWS HEALTH AND | § | |
| REHABILITATION CENTER, | § | |
| SAVASENIORCARE | § | DALLAS COUNTY, TEXAS |
| ADMINISTRATIVE SERVICES, LLC, | § | |
| SAVA SENIOR CARE CONSULTING, | § | |
| LLC, and SAVASENIORCARE, LLC. | § | |

### PLAINTIFF'S ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW DEOBORAH WILLIAMS, as Next Friend of LENOIR WAREING, who appears to be incompetent and who doctors have advised is incompetent, hereinafter referred to as Plaintiff, complaining of SSC DALLAS OPERATING CO., LLC, Individually and d/b/a THE MEADOWS HEALTH AND REHABILITATION CENTER, SAVASENIORCARE ADMINISTRATIVE SERVICES, LLC, SAVA SENIOR CARE CONSULTING, LLC, and SAVASENIORCARE, LLC, hereinafter referred to as Defendants, and would show the Court and Jury as follows:

### I.
### PARTIES

1.      LENOIR WAREING appeared to be incompetent at all times pertinent to this cause of action and filing of such lawsuit, and the doctors advised that she was

PLAINTIFF'S ORIGINAL PETITION - Page 1

incompetent at the time of the filing of the lawsuit. A Durable General Power of Attorney dated November 5, 2014, was fully executed by LENOIR WAREING empowering DEBORAH WILLIAMS as attorney in fact. Thus, DEBORAH WILLIAMS is executing the power of attorney to file the lawsuit on behalf of LENOIR WAREING, Individually. In the alternative, DEBORAH WILLIAMS filed this lawsuit as next friend of LENOIR WAREING, who appeared to be incompetent. There was no adverse interest between LENOIR WAREING and DEBORAH WILLIAMS. DEBORAH WILLIAMS is the closest relative of LENOIR WAREING. DEBORAH WILLIAMS, as Next Friend of Plaintiff LENOIR WAREING, are residents of Dallas, Dallas County, Texas.

2.     Defendant SSC DALLAS OPERATING CO., LLC, Individually and d/b/a THE MEADOWS HEALTH AND REHABILITATION CENTER is a domestic limited liability company doing business in the State of Texas and holds its principal place of business in Texas at 5300 W. Sam Houston Pkwy., N, Houston, TX 77041. Defendant SSC DALLAS OPERATING CO., LLC, Individually and d/b/a THE MEADOWS HEALTH AND REHABILITATION CENTER may be served with process by serving its registered agent, CT Corporation Systems, 1999 Bryan Street, Suite 900, Dallas, TX 75201-3136.

3.     Defendant SAVASENIORCARE ADMINISTRATIVE SERVICES, LLC, is a foreign limited liability company doing business in the State of Texas and holds its principal place of business in Texas at 5300 W. Sam Houston Pkwy., N, Houston, TX 77041. Defendant SAVASENIORCARE ADMINISTRATIVE SERVICES, LLC is the manager and supervisor of SSC DALLAS OPERATING CO., LLC, Individually and d/b/a THE MEADOWS HEALTH AND REHABILITATION CENTER. Defendant may

PLAINTIFF'S ORIGINAL PETITION - Page 2

be served with process by serving its registered agent, CT Corporation Systems, 1999 Bryan Street, Suite 900, Dallas, TX 75201-3136.

4.      Defendant SAVA SENIOR CARE CONSULTING, LLC, is a foreign limited liability company doing business in the State of Texas and holds its principal place of business in Texas at 5300 W. Sam Houston Pkwy., N, Houston, TX 77041. Defendant SAVA SENIOR CARE CONSULTING, LLC is the manager and supervisor of SSC DALLAS OPERATING CO., LLC, Individually and d/b/a THE MEADOWS HEALTH AND REHABILITATION CENTER. Defendant may be served with process by serving its registered agent, CT Corporation Systems, 1999 Bryan Street, Suite 900, Dallas, TX 75201-3136.

5.      Defendant SAVASENIORCARE, LLC, is a Delaware Corporation doing business in the State of Texas, whose principal place of business is located in Atlanta, Georgia. This Defendant can be served by serving its registered agent for services, Corporation Process Company, 328 Alexander Street, Suite 10, Marietta, Georgia 30060. Defendant SAVASENIORCARE, LLC is the owner and operator of Defendant SAVASENIORCARE ADMINISTRATIVE SERVICES, LLC, SAVA SENIOR CARE CONSULTING, LLC, and Defendant SSC DALLAS OPERATING CO., LLC, Individually and d/b/a THE MEADOWS HEALTH AND REHABILITATION CENTER.

## II.
## DISCOVERY UNDER LEVEL 3

1.      Pursuant to Tex. R. Civ. P. 190 *et. seq.*, Plaintiffs move that discovery be conducted under a Level 3 discovery control plan. This is a medical negligence case

**PLAINTIFF'S ORIGINAL PETITION - Page 3**

brought against multiple Defendants.

## III.
## NOTICE

1.      Plaintiffs provided notice to Defendants in accordance with §74.051 of the

Civil Practice and Remedies Code on February 5, 2016, that Plaintiff intended to assert a

health care liability claim arising out of the medical care rendered to LENOIR WAREING.

## IV.
## JURISDICTION, VENUE, & TEXAS MEDICAL
## LIABILITY AND INSURANCE IMPROVEMENT ACT

1.      Venue is proper in Dallas County, Texas, because the cause of action

accrued in Dallas County. Defendants SSC DALLAS OPERATING CO., LLC,

Individually and d/b/a THE MEADOWS HEALTH AND REHABILITATION CENTER

maintain an office at 8383 Meadow Rd. Dallas, TX 75231, and its principal place of

business is in Dallas County.  Jurisdiction is proper because the damages sought are

within the jurisdictional limits of this Court.

2.      Venue is proper in the State of Texas because Defendants SSC DALLAS

OPERATING CO., LLC, Individually and d/b/a THE MEADOWS HEALTH AND

REHABILITATION CENTER, SAVASENIORCARE ADMINISTRATIVE SERVICES,

LLC SAVA SENIOR CARE CONSULTING, LLC's principal place of business is located

at 5300 W. Sam Houston Pkwy., N, Houston, TX  77041.

3.      Plaintiffs' claims are brought in accordance with Chapter 74 of the Civil

Practice & Remedies Code.

4.     Plaintiffs aver that the damage limitation provisions contained in Chapter 74 of the Civil Practice & Remedies Code are unconstitutional under the United States Constitution and/or the Constitution of the State of Texas.

## V.
## FACTS

1.     The incidents which form the basis of this lawsuit occurred in Dallas, Dallas County, Texas. At the time of the incidents described in Section V, LENOIR WAREING was a resident of the Nursing Home.

2.     At all relevant times, Defendant, SSC DALLAS OPERATING CO., LLC, was a licensed nursing home doing business in the State of Texas under the name of THE MEADOWS HEALTH AND REHABILITATION CENTER.

3.     Defendants, SSC DALLAS OPERATING CO., LLC, Individually and d/b/a THE MEADOWS HEALTH AND REHABILITATION CENTER, SAVASENIORCARE ADMINISTRATIVE SERVICES, LLC, SAVA SENIOR CARE CONSULTING, LLC, and SAVASENIORCARE, LLC are companies that operate a long-term care facility for monetary profits in the State of Texas. Defendants, SSC DALLAS OPERATING CO., LLC, Individually and d/b/a THE MEADOWS HEALTH AND REHABILITATION CENTER, SAVASENIORCARE ADMINISTRATIVE SERVICES, LLC, SAVA SENIOR CARE CONSULTING, LLC, and SAVASENIORCARE, LLC, participated in the Medicare and Medicaid programs. By reason of their application to the State of Texas for nursing home licensure and certification, Defendants, SSC DALLAS OPERATING CO., LLC, Individually and d/b/a THE MEADOWS HEALTH AND REHABILITATION CENTER,

SAVASENIORCARE ADMINISTRATIVE SERVICES, LLC, SAVA SENIOR CARE CONSULTING, LLC, and SAVASENIORCARE, LLC were able to enjoy substantial revenues paid for by taxpayer funded programs. Having availed themselves of the privileges and financial benefits available to licensed nursing home operations, certified for participation in such programs, Defendants, SSC DALLAS OPERATING CO., LLC, Individually and d/b/a THE MEADOWS HEALTH AND REHABILITATION CENTER, SAVASENIORCARE ADMINISTRATIVE SERVICES, LLC, SAVA SENIOR CARE CONSULTING, LLC, and SAVASENIORCARE, LLC are and at all times material to this lawsuit and were required to comply with (a) the rules and regulations promulgated by the Federal Government, 42 C.F.R., §§483.1, *et seq.*, and (b) Texas Department of Human Services 40 Texas Administrative Code, Chapter 19.1, *et. seq.* Defendants, SSC DALLAS OPERATING CO., LLC, Individually and d/b/a THE MEADOWS HEALTH AND REHABILITATION CENTER, SAVASENIORCARE ADMINISTRATIVE SERVICES, LLC, SAVA SENIOR CARE CONSULTING, LLC, and SAVASENIORCARE, LLC. were at all times material to this lawsuit required to comply with the foregoing rules and regulation in care for LENOIR WAREING.

4.      At all times material hereto, LENOIR WAREING was a resident of SSC DALLAS OPERATING CO., LLC, Individually and d/b/a THE MEADOWS HEALTH AND REHABILITATION CENTER managed by SAVASENIORCARE ADMINISTRATIVE SERVICES, LLC, SAVA SENIOR CARE CONSULTING, LLC, and SAVASENIORCARE, LLC, owned and operated by SAVASENIORCARE, LLC. On or about April 7, 2014, LENOIR WAREING was a resident of THE MEADOWS HEALTH

AND REHABILITATION CENTER. Prior to admission to Defendant's facility, LENOIR WAREING was free from skin wounds, pressure sores, decubitus ulcers, or skin infections of any type. The High Risk for Impaired Skin Integrity Nursing Care Plan for Ms. LENOIR WAREING required that nurses and other healthcare givers employed by Defendants to turn and reposition her every two hours and as needed, monitor her meal intake, assist her to the toilet every two to three hours as needed, and to provide her with perineal care after every incontinent episode. Nurses and other healthcare givers employed by Defendants were required to follow the care plan and provide proper health care to LENOIR WAREING.

5.      On or about April 7, 2014, LENOIR WAREING was documented with Stage-I pressure ulcer to her sacrum area. On or about April 14, 2014, the pressure ulcer to her sacrum area was documented as a State-II. On April 25, 2014, the pressure ulcer was documented as healed.

6.      On May 6, 2014, LENOIR WAREING was transferred to Texas Health Presbyterian Hospital Dallas. She was admitted with a severe Stage-IV deep tissue injury to her sacral area and deep tissue injuries to her left lateral foot and heel, and severe malnutrition and dehydration.

7.      During LENOIR WAREING'S stay at THE MEADOWS HEALTH AND REHABILITATION CENTER, she developed a pressure ulcer that progressed to the most severe Stage-IV degree due to the negligence of the Defendants' agents and employees.

8. During LENOIR WAREING'S stay at Defendant THE MEADOWS HEALTH AND REHABILITATION CENTER, she developed severe malnutrition and dehydration due to the negligence of the Defendants' agents and employees.

9. LENOIR WAREING was hospitalized at Texas Health Presbyterian Hospital Dallas from May 6, 2014, through May 14, 2014, at which time she was transferred to Kindred Hospital where she continued to receive wound care treatment for her pressure ulcers including surgical debridements and a wound vacuum dressing.

10. On June 19, 2014 LENOIR WAREING was transferred to Golden Acres Living & Rehabilitation where she received further skilled wound care treatment for the Stage-IV pressure ulcers. During this time she received a gastric feeding tube and urinary catheter. On or about October 21, 2014, the Stage-IV sacral pressure ulcer healed.

11. Defendants SSC DALLAS OPERATING CO., LLC, Individually and d/b/a THE MEADOWS HEALTH AND REHABILITATION CENTER, SAVASENIORCARE ADMINISTRATIVE SERVICES, LLC, SAVA SENIOR CARE CONSULTING, LLC, and SAVASENIORCARE, LLC, acting individually and/or by and through their respective employees, agents, and representatives, failed to monitor, diagnose, and treat LENOIR WAREING'S medical condition.

12. LENOIR WAREING suffered damages as a result of the conduct of Defendants, as more specifically detailed below.

## VI.
## CAUSES OF ACTION

1. Defendants SSC DALLAS OPERATING CO., LLC, Individually and d/b/a

THE MEADOWS HEALTH AND REHABILITATION CENTER, SAVASENIORCARE ADMINISTRATIVE SERVICES, LLC, SAVA SENIOR CARE CONSULTING, LLC, and SAVASENIORCARE, LLC, were negligent by and through their employees, agents and/or representatives in the following respects:

      a.    Failing to properly evaluate the condition of Plaintiff LENOIR WAREING;

      b.    Failing to properly assess the condition of Plaintiff LENOIR WAREING;

      c.    Failing to properly monitor the condition of Plaintiff LENOIR WAREING;

      d.    Failing to provide proper treatment and/or care to Plaintiff LENOIR WAREING;

      e.    Failing to properly prevent development of pressure ulcers, malnutrition, dehydration, and infection;

      f.    Failing to properly treat the pressure ulcers, malnutrition, dehydration, and infection.

2.     Each and every one of the foregoing acts of omission and commission, taken separately and collectively, constituted the direct and proximate cause of the injuries, damages of LENOIR WAREING and suffered by Plaintiff as described more fully below.

3.     Defendants SSC DALLAS OPERATING CO., LLC, Individually and d/b/a THE MEADOWS HEALTH AND REHABILITATION CENTER, SAVASENIORCARE ADMINISTRATIVE SERVICES, LLC, SAVA SENIOR CARE CONSULTING, LLC, and SAVASENIORCARE, LLC, are further liable for punitive damages because they authorized or ratified their agents' and employees' gross negligence and/or it was grossly negligent in the hiring of unfit agents or employees. SSC DALLAS OPERATING

CO., LLC, Individually and d/b/a THE MEADOWS HEALTH AND REHABILITATION CENTER, SAVASENIORCARE ADMINISTRATIVE SERVICES, LLC, SAVA SENIOR CARE CONSULTING, LLC, and SAVASENIORCARE, LLC, further committed gross negligence or malice through the actions or inactions of vice principal(s) who had authority to employ, direct, and discharge servants of the master and/or those employees or agents engaged in the performance of non-delegable or absolute duties of SSC DALLAS OPERATING CO., LLC, Individually and d/b/a THE MEADOWS HEALTH AND REHABILITATION CENTER, SAVASENIORCARE ADMINISTRATIVE SERVICES, LLC, SAVA SENIOR CARE CONSULTING, LLC, and SAVASENIORCARE, LLC. Specifically, Title 40, Texas Administrative Code, Rules §19.1902(a) and 19.1906(b), which states:

> *The facility must have a governing body, or designated person, functioning as a governing body, that is legally responsible for establishing and implementing policies regarding the management and operation of the facility. 40 Tex. Admin. Code §19.1902(a)*
>
> *Agreements pertaining to services furnished by outside resources must specify in writing that the facility assumes responsibility for:*
>
> > *(1)    Obtaining services that need professional standards and principals; and,*
> > *(2)    The timeliness of the services.*
>
> *40 Tex. Admin. Code §19.1906(b)*

4.    Thus, SSC DALLAS OPERATING CO., LLC, Individually and d/b/a THE MEADOWS HEALTH AND REHABILITATION CENTER, SAVASENIORCARE ADMINISTRATIVE SERVICES, LLC, SAVA SENIOR CARE CONSULTING, LLC, and SAVASENIORCARE, LLC, have a non-delegable duty and are legally responsible for the

negligence, gross neglect, malice, and conduct done "knowingly", including acts or omissions, for services furnished in the nursing home, whether they are furnished directly or under contracts, such as with agencies that provide temporary nurses or nurses' aides.

5.      Further, Defendants SSC DALLAS OPERATING CO., LLC, Individually and d/b/a THE MEADOWS HEALTH AND REHABILITATION CENTER, SAVASENIORCARE ADMINISTRATIVE SERVICES, LLC, SAVA SENIOR CARE CONSULTING, LLC, and SAVASENIORCARE, LLC, are responsible for the acts and/or omissions of its agents, representatives, physician assistants, nurses, and employees who provided treatment to LENOIR WAREING under the theories of *respondeat superior, apparent/ostensible agency, single business enterprise, and joint enterprise* as those concepts are understood under Texas law.

6.      Defendant SAVASENIORCARE, LLC, owns and operates both SSC DALLAS OPERATING CO., LLC, Individually and d/b/a THE MEADOWS HEALTH AND REHABILITATION CENTER and SAVASENIORCARE ADMINISTRATIVE SERVICES, LLC, and SAVA SENIOR CARE CONSULTING LLC.   Accordingly, this entity is vicariously liable for the acts and omissions of THE MEADOWS HEALTH AND REHABILITATION CENTER and its employees under the theory of respondeat superior or actual, ostensible, or apparent agency.   In addition, the nursing staff that cared for LENOIR WAREING was employed by both SSC DALLAS OPERATING CO., LLC, Individually and d/b/a THE MEADOWS HEALTH AND REHABILITATION CENTER, SAVASENIORCARE ADMINISTRATIVE SERVICES, LLC, and SAVA SENIOR CARE

CONSULTING, LLC, and was acting as an employee, servant, apparent, or ostensible agent within the course and scope of its agency or employment with both SSC DALLAS OPERATING CO., LLC, Individually and d/b/a THE MEADOWS HEALTH AND REHABILITATION CENTER and SAVASENIORCARE ADMINISTRATIVE SERVICES, LLC, and SAVA SENIOR CARE CONSULTING, LLC. Therefore, SAVASENIORCARE, LLC, is negligent/responsible for the acts and omissions of the nursing staff who cared for LENOIR WAREING under the theory of respondeat superior or actual, ostensible, or apparent agency.

7.     In addition, SAVASENIORCARE, LLC, owned and operated SSC DALLAS OPERATING CO., LLC, Individually and d/b/a THE MEADOWS HEALTH AND REHABILITATION CENTER, SAVASENIORCARE ADMINISTRATIVE SERVICES, LLC, and SAVA SENIOR CARE CONSULTING, LLC, and shared officers and/or directors with SSC DALLAS OPERATING CO., LLC, Individually and d/b/a THE MEADOWS HEALTH AND REHABILITATION CENTER, SAVASENIORCARE ADMINISTRATIVE SERVICES, LLC, and SAVA SENIOR CARE CONSULTING, LLC. Further, SSC DALLAS OPERATING CO., LLC, Individually and d/b/a THE MEADOWS HEALTH AND REHABILITATION CENTER, SAVASENIORCARE ADMINISTRATIVE SERVICES, LLC, SAVA SENIOR CARE CONSULTING, LLC, and SAVASENIORCARE, LLC, were engaged in a joint enterprise with each other and had an authoritative voice and right of control over an aspect of the enterprise that the other did not, and without each other, could not provide comprehensive healthcare services to

LENOIR WAREING in the furtherance of the joint enterprise and common purpose of providing patient care.

8. Moreover, SAVASENIORCARE, LLC, acting through its apparent, ostensible, actual, or by estoppels agents, officers, employees, subsidiaries, and/or affiliated companies, organized and operated SSC DALLAS OPERATING CO., LLC, Individually and d/b/a THE MEADOWS HEALTH AND REHABILITATION CENTER, SAVASENIORCARE ADMINISTRATIVE SERVICES, LLC, and SAVA SENIOR CARE CONSULTING, LLC, through the time of the rendition of healthcare services to LENOIR WAREING, that the ultimate parent corporation (SAVASENIORCARE, LLC) and the subsidiary corporations SSC DALLAS OPERATING CO., LLC, Individually and d/b/a THE MEADOWS HEALTH AND REHABILITATION CENTER, SAVASENIORCARE ADMINISTRATIVE SERVICES, LLC, and SAVA SENIOR CARE CONSULTING, LLC, should be treated as one and the same legal entity with regard to any liability to Plaintiff arising out of the claims made in this petition due to the control asserted by SAVASENIORCARE, LLC, over the other and the inter-relationship of their business dealings and financial arrangements, their corporate formalities should be disregarded, and each of them held vicariously liable for the conduct of the other.

9. Each such act and omission, singularly or in combination with others, was a proximate cause of the injuries to LENOIR WAREING.

10. Each and every one of the foregoing acts of omission and commission, taken separately and collectively, constituted the direct and proximate cause of the injuries, damages, and death suffered by Plaintiffs as described more fully below. Some or all of

the foregoing acts of Defendants amounted to gross negligence as that concept is understood under Texas law or "malice/gross neglect" as that term is defined in the Civ. Prac. & Rem. Code §41001(7)(b) for which Plaintiffs seek exemplary damages [double check this citation].

## VII.

## DAMAGES TO LENOIR WAREING

1.      As a result of Plaintiff LENOIR WAREING'S injuries, she has endured physical pain and suffering in the past and will in all likelihood endure physical pain and suffering in the future.

2.      Plaintiff LENOIR WAREING has suffered mental anguish in the past and in all likelihood will suffer mental anguish in the future.

3.      Plaintiff LENOIR WAREING has suffered physical impairment, physical incapacity, physical disability, and physical disfigurement in the past and in all likelihood will suffer physical impairment, physical incapacity, physical disability, and physical disfigurement in the future.

4.      Plaintiff LENOIR WAREING has incurred medical expenses in the past and in all reasonable probability will incur medical expenses in the future.

## IX.

## REQUEST FOR DISCLOSURE

1.      Under Texas Rule of Civil Procedure 194, Plaintiff request that Defendants SSC DALLAS OPERATING CO., LLC, Individually and d/b/a THE MEADOWS HEALTH AND REHABILITATION CENTER, SAVASENIORCARE ADMINISTRATIVE

SERVICES, LLC, SAVA SENIOR CARE CONSULTING, LLC, and SAVASENIORCARE,

LLC, disclose, within fifty (50) days of the service of this request, the information or

material described in Rule 194.2 (a) through (k).

## X.
## PLAINTIFF'S FILING OF
## EXPERT REPORTS PURSUANT TO C.P.R.C. §74.051

1.      Pursuant to C.P.R.C. §74.051, Plaintiff attaches, files, and serves the

following expert reports with regard to all Defendants:

>       a.      Exhibit 1 - Expert Report of Keith Miller, M.D., with
>               attached Curriculum Vitae (Ex. 1A); and

2.      Pursuant to this filing, these expert reports are not to be admissible in

evidence by the Defendants; shall not be used in a deposition, trial, or other proceeding;

and shall not be referred to by Defendants during the course of the action for any purpose.

## XI.
## PRE-JUDGMENT INTEREST

1.      Plaintiff seeks pre-judgment interest from the earliest date and at the

highest legal rate allowed by law.

## XII.
## JURY DEMAND

1.      Plaintiff respectfully requests a trial by jury and submits the appropriate

jury fee to the Court this day.

## XIII.
## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff requests that Defendants SSC

DALLAS OPERATING CO., LLC, Individually and d/b/a THE MEADOWS HEALTH

AND REHABILITATION CENTER, SAVASENIORCARE ADMINISTRATIVE SERVICES, LLC, SAVA SENIOR CARE CONSULTING, LLC, and SAVASENIORCARE, LLC, be cited to appear and answer herein, and that on final trial Plaintiff have judgment against the Defendants for damages in an amount in excess of the minimum jurisdictional limits of this Court, pre-judgment and post-judgment interest as provided by law, punitive damages, costs of suit, and such other and further relief to which Plaintiff is justly entitled.

Respectfully submitted,

THE LAW OFFICES OF REYNOLDS & REYNOLDS, P.L.L.C.

By_____

RUSSELL R. REYNOLDS
State Bar No. 24009359
rusty@rrlfirm.com
DEBRA S. REYNOLDS
State Bar No. 24043891
debra@rrlfirm.com
2591 Dallas Parkway, #300
Frisco, Texas 75034
(214) 891-6606
(972) 731-4384-8739 (fax)

ATTORNEYS FOR PLAINTIFF

**PLAINTIFFS REQUEST A JURY TRIAL**

**PLAINTIFF'S ORIGINAL PETITION - Page 16**

# Keith E. Miller, M.D., F.A.A.F.P.

670 Traha Street • Center  Texas 75953
(936) 573-2716 • Fax (936) 598-5259

December 7, 2015

Mr. Russell R. Reynolds, Attorney at Law
The Law Offices of Reynolds & Reynolds, P.L.L.C.
2591 Dallas Parkway, Suite 300
Frisco, Texas  75034

Re:  Ms. Lenoir Wareing

Dear Mr. Reynolds:

Thank you for allowing me to review this case on behalf of Ms. Lenoir Wareing. My opinions in this report are based on the information I have reviewed to date and my education, training, and direct experience in the diagnosis and treatment of patients with conditions similar to those of Ms. Lenoir Wareing as described in the materials I have reviewed and discussed in this report. Each opinion is based on reasonable medical and nursing, probability and certainty.

## BACKGROUND

My name is Keith E. Miller, M.D., and I give this report for the purpose of complying with any applicable provisions or codes. As my attached curriculum vitae demonstrates and which is incorporated into this report by reference, I am a Medical Doctor currently licensed to practice in the State of Texas. I currently practice in nursing homes similar to The Meadows Health and Rehabilitation Center in Dallas, Texas. I have had numerous patients similar to Ms. Lenoir Wareing. I am board-certified in family medicine and I have been in practice for more than 25 years. By virtue of my education, training, and direct experience, I am qualified to render opinions regarding the standards of care as they apply to this particular case.

I am over the age of 18, of sound mind, and capable of preparing this expert medical report. My opinions in this report are based on the information I have reviewed to date, as well as my education, training, knowledge, and direct experience in the diagnosis and treatment of patients with conditions similar to those of Ms. Lenoir Wareing, as described in the materials I have reviewed and

1



discussed in this report. My opinions are based on reasonable medical and nursing, probability and certainty. My opinions concern the care and treatment received by Ms. Lenoir Wareing, or lack thereof, in regard to the applicable standards of care and the manner, in which the care rendered to Ms. Lenoir Wareing by the healthcare facility in this case, fell below the standards of care and caused the injuries and illnesses of Ms. Lenoir Wareing.

It is impossible in an expert medical report to marshal all of the proof regarding the standard of care, breach, and causation and include it within my expert opinions in this case. My report represents a good faith effort to inform the health-care facility of the specific conduct that I am calling into question and to provide a basis for anyone to conclude that the claims in this matter have merit. Obviously, any defendant in a medical malpractice case has medical knowledge of medical terms which, when read in context with my opinions, will be clear to any competent healthcare facility.

This report will provide a summary of my opinions, as of this date, regarding: 1) the applicable standards of care at issue in this case; 2) how the applicable standards of care were violated and breached; 3) how the violations and breaches of the applicable standards of care resulted in the injuries and illnesses of Ms. Lenoir Wareing; and 4) what the health-care facility in this case should have done differently to prevent the injuries and illnesses of Ms. Wareing. I reserve the right to amend, or add to, my opinions upon further review of records, testimony, or facts, as they become available.

## MY EXPERTISE

I am a medical doctor currently licensed to practice in the State of Texas. I have been a licensed medical doctor since 1985, have been practicing medicine continuously since then, including during the time of this claim, and as part of my practice, have been, and am currently, involved in the diagnosis, care, and treatment of many patients similar to Ms. Lenoir Wareing. I am familiar with the diagnosis and treatment of patients with malnutrition, dehydration, decubitus ulcers or pressure sores, infections and sepsis, illnesses, and their complications, along with any other conditions experienced by Ms. Lenoir Wareing. I am familiar with the standards of care applicable to physicians, nurses, hospitals, nursing homes, rehabilitation centers and their staffs that treat patients such as Ms. Wareing. My training is similar to the training of the healthcare providers, nurses, and facility staff in this case.

After graduating from medical school in 1985 at the University of Arkansas, I received additional training and experience in a family practice residency program which I successfully completed in 1988. I have had over 25 years' experience practicing medicine in office settings, hospitals, nursing homes, rehabilitation

2

centers and emergency departments. I am board-certified in Family Medicine by the American Board of Family Medicine, and have been in practice for more than 25 years. By virtue of my education, training, knowledge and direct experience, I am qualified to render opinions regarding the standards of care as they apply to this particular case, including the standards of care applicable to physicians, nurses, hospitals, nursing homes, rehabilitation centers and their staffs treating patients for malnutrition, dehydration, decubitus ulcers or pressure sores, infections and sepsis, illnesses, and their complications, along with any other conditions exhibited by Ms. Lenoir Wareing, because I have treated many patients with these conditions.

## A COPY OF MY CV IS ATTACHED

My attached curriculum vitae is incorporated herein as part of my report.

## MATERIALS REVIEWED

The specific medical records of Ms. Lenoir Wareing which I have reviewed include her medical records from the following:

1) The Meadows Health and Rehabilitation Center in Dallas, Texas;
2) Texas Health Presbyterian Hospital of Dallas in Dallas, Texas;
3) Kindred Hospital Dallas Central in Dallas, Texas; and
4) Golden Acres Living & Rehabilitation in Dallas, Texas.

## SIGNIFICANT FACTS

Ms. Lenoir Wareing is an adult female whose date of birth is XXXXXXXXXXX. In the fall of 2013, Ms. Wareing was 66 years-old and living at home when she suffered a cerebrovascular accident or stroke. After treatment in the hospital, Ms. Wareing was transferred to a nursing home for further treatment and rehabilitation.

On October 29, 2013, Ms. Wareing was admitted to The Meadows Health and Rehabilitation Center in Dallas, Texas (The Meadows), where she remained a resident until May 6, 2014.

The admitting records made by the nursing staff of this facility documented that at the time of admission to this nursing home, Ms. Wareing was alert and oriented to person, place, and time. She was able to express her needs and feed herself. Her hearing and vision were adequate. She was able to move all extremities and feed herself. She was free of contractures, free of infections, well-nourished, well-hydrated, without injuries, and without pain. Her skin examination was negative for pressure sores or infections.

Ms. Lenoir Wareing suffered from malnutrition while a resident in the care of

3

The Meadows due to a failure of this facility to meet her nutritional needs. After her admission to The Meadows Ms. Wareing was documented as being well-nourished as evidenced by normal laboratory testing consisting of a serum albumin level of 4.0 grams per deciliter (g/dl) (normal 3.5 – 5.7 g/dl) and a serum pre-albumin level of 26.9 milligrams per deciliter (mg/dl) (normal 17.0 – 40.0 mg/dl). By the end of her stay at this nursing home, Ms. Wareing's nutritional status had deteriorated as evidenced by abnormally low serum protein levels. At the time Ms. Wareing left The Meadows, she was documented as having a serum albumin level of 2.7 g/dl and a serum pre-albumin level of 11.3 mg/dl.

Ms. Lenoir Wareing suffered from dehydration while a resident in the care of The Meadows Health and Rehabilitation Center. This facility failed to provide adequate fluids and hydration to Ms. Wareing while she was a resident of this facility. At the time of her admission to this nursing home, Ms. Wareing was documented as being well-hydrated as evidenced by normal renal function laboratory testing, specifically a normal serum BUN and creatinine level. Ms. Wareing was documented to have a serum BUN of 10 mg/dl (normal 7 – 20 mg/dl) and a serum creatinine level of 0.6 mg/dl (normal 0.6 – 1.2 mg/dl).

During her stay at this nursing home, Ms. Wareing's hydration status deteriorated. At a hospitalization immediately following her discharge from The Meadows, Ms. Wareing had an elevated serum BUN level of 22 mg/dl and an elevated serum creatinine level of 1.27 mg/dl. Ms. Wareing's physician documented in the medical record that this patient's abnormally elevated serum creatinine level was "more than double her baseline creatinine."

Due to the failure of The Meadows Health and Rehabilitation Center to properly care for Ms. Lenoir Wareing, she developed decubitus ulcers or pressure sores over multiple parts of her body. When this resident first entered this nursing home, she was noted to be free of pressure sores or skin infections of any kind. Due to the failure of this nursing home to employ appropriate measures to prevent pressure sores and decubitus ulcers, Ms. Lenoir Wareing developed multiple decubitus ulcers or pressure sores over different parts of her body, up to stage IV in size, which is the most severe stage. This resident's pressure sores were so severe that following her final discharge from The Meadows, Ms. Wareing required a special wound-care consultation in the hospital for treatment of her pressure sores. She was found to have a large stage IV deep tissue injury or pressure sore over her coccyx, along with a another deep tissue injury or pressure sore on her left foot.

While Ms. Wareing was a resident in the care of The Meadows, the pressure sore over her sacrum was only described as Stage II in size at its worst on April 14, 2014. The pressure sore on Ms. Wareing's foot was never mentioned in the records of The Meadows. On April 25, 2014, the nursing staff of The Meadows

4

stated in the medical record that the pressure sore on Ms. Wareing's sacrum was "healed". It was not mentioned again as recurring in the medical record for the remainder of Ms. Wareing's stay in The Meadows which ended with her discharge on May 6, 2014.

The Meadows Health and Rehabilitation Center failed to prevent and properly treat the infections of Ms. Lenoir Wareing's urinary tract on multiple occasions. These localized infections caused, more likely than not, Ms. Wareing to develop sepsis, or a generalized infection of her bloodstream at least twice. Ms. Wareing's urinary tract infections and sepsis developed and became severe while a resident in the care of The Meadows. These infections required her to be hospitalized at least twice, once beginning February 1, 2014 and again immediately following her final discharge from the Meadows on May 6, 2014.

Ms. Wareing's overall condition continued to worsen due to the negligence she suffered while a resident of The Meadows Health and Rehabilitation Center. She left this nursing home for the final time on May 6, 2014. Following her final discharge from this nursing home, Ms. Wareing was first admitted to the hospital and then a specialty wound care hospital due to the severity of her pressure sores. She required extensive treatment in these facilities as well as another nursing home to which she was ultimately admitted. Ms. Wareing had to have extensive care and treatment as a result of the illnesses and injuries she developed due to the negligence of The Meadows while she was a resident in their care. She ultimately required prolonged hospitalizations, extensive therapy, surgical procedures, a urinary bladder catheter (Foley catheter), and a percutaneous endoscopically-placed gastrostomy feeding tube (PEG tube).

More likely than not and to a reasonable degree of medical and nursing, probability and certainty, Ms. Wareing will continue to suffer a loss of physical function, as well as other illnesses and complications as a result of the negligence from which she suffered while a resident in the care of The Meadows Health and Rehabilitation Center.

## FAMILIARITY WITH THE STANDARD OF CARE

At the time of the care and treatment of Ms. Lenoir Wareing by The Meadows Health and Rehabilitation Center in Dallas, Texas, from October 2013 through May 2014, I was familiar with the minimum medical standards of care applicable to the assessment, diagnosis and treatment of patients with malnutrition, dehydration, decubitus ulcers or pressure sores, infections and sepsis, injuries and illnesses, as well as their complications and other medical conditions similar to those experienced by Ms. Lenoir Wareing and described in the referenced medical records. I am familiar with the medical and nursing standards of care for the above referenced conditions applicable to The Meadows Health and Rehabilitation Center

5

in Dallas, Texas. The minimum standard of care for treatment of patients with similar signs, symptoms, and conditions as Ms. Lenoir Wareing that are the basis of this report, is a universally-accepted standard of care and does not differ from community to community.

From the time of the medical treatment of Ms. Lenoir Wareing from October 2013 through May 2014, and through the present, I have had an active clinical practice as a family practitioner in Center, Texas that includes providing care to adult patients in nursing homes and rehabilitation centers, such as Ms. Lenoir Wareing. During my career as a family practitioner, I have worked with and or supervised medical office staff, hospital staff, nursing home staff, and rehabilitation center staff, including medical technologists and nurses, in the care of my patients. I have also participated in the development and use of protocols, policies and procedures for the care of patients with malnutrition, dehydration, decubitus ulcers or pressure sores, infections and sepsis, injuries, and illnesses as well as their causes and complications, including adults such as Ms. Lenoir Wareing. In addition, based on my education, training, knowledge, and direct experience, I am familiar with the accepted and expected, standards of care, as listed below, for nursing home and rehabilitation center facilities, who take care of patients with conditions such as malnutrition, dehydration, decubitus ulcers or pressure sores, infections and sepsis, injuries, illnesses, and their complications, and can offer opinions on the standards of care, the breaches of the standards of care and the causation of the injuries from these breaches.

In my medical practice, I routinely rely on medical records, nursing records, lab reports, diagnostic tests and images, consulting physician reports and other patient data. I consider materials of this type to be generally reliable, unless evidenced otherwise, and they are the type of materials routinely relied upon by physicians and clinical staff in providing care to patients.

## CASE SPECIFIC EXPERTISE

At the time of the medical treatment of Ms. Lenoir Wareing, from October 2013 through May 2014, I was treating patients with symptoms similar to those experienced by Ms. Wareing. I am familiar with the accepted medical and nursing standards of care applicable to the assessment, diagnosis, and treatment of patients with malnutrition, dehydration, decubitus ulcers or pressure sores, infections and sepsis, injuries, and illnesses, as well as any other medical conditions similar to those experienced by Ms. Lenoir Wareing during that time and described in the referenced medical records. I am familiar with the standards of care for physicians, nurses, and nursing home and rehabilitation center staff treating patients such as Ms. Wareing. I am familiar with the medical and nursing standards of care for the above referenced medical conditions, including malnutrition, dehydration, decubitus ulcers or pressure sores, infections and sepsis,

injuries, illnesses, and their complications, as they apply to The Meadows Health and Rehabilitation Center. The accepted and applicable standards of care for treatment of patients with similar signs, symptoms, and conditions as Ms. Lenoir Wareing, that are the basis of this report, are national standards of care and do not differ from community to community, and also apply to the specific medical care provided to Ms. Wareing in this case. The accepted medical and nursing standards of care for the assessment, diagnosis, and treatment of medical conditions similar to those of Ms. Lenoir Wareing apply to all nursing home and rehabilitation center facilities. I know the accepted standards of care, the breaches and violations of the standards of care, and the causation link between the breaches and violations of the standards of care and the injuries, illnesses, and infections of Ms. Lenoir Wareing, as they apply to The Meadows Health and Rehabilitation Center, on the basis of my education, knowledge, training, and direct experience.

I acquired this education, knowledge, training and experience through:

1) My attending, and successfully completing, medical school classes, and residency, that teach the evaluation, diagnosis, care and treatment of patients with the same or similar conditions as Ms. Lenoir Wareing, and for malnutrition, dehydration, decubitus ulcers or pressure sores, infections and sepsis, and their complications;

2) Practical experience of diagnosing and treating patients with the same or similar conditions as Ms. Lenoir Wareing, and for malnutrition, dehydration, decubitus ulcers or pressure sores, infections and sepsis, and their complications;

3) Discussions with colleagues at yearly conferences, seminars and meetings;

4) Study of technical works routinely published in textbooks, journals and literature concerning the evaluation, diagnosis, care and treatment of patients with the same or similar conditions as Ms. Lenoir Wareing, and for malnutrition, dehydration, decubitus ulcers or pressure sores, infections and sepsis, and their complications;

5) My routine discussions and consultations with other physicians who also treat patients with the same or similar conditions as Ms. Lenoir Wareing, and for malnutrition, dehydration, decubitus ulcers or pressure sores, infections and sepsis, and their complications;

6) My routine and regular contact with nursing home nurses, staff and residents who take care of patients with the same or similar conditions as Ms. Lenoir Wareing, and for malnutrition, dehydration, decubitus ulcers or pressure sores, infections and sepsis, and their complications;

7

7) My knowledge and experience giving lectures and in-service conferences to the nurses and staff;

8) My experience serving on numerous hospital and nursing home committees; and

9) My observation of nurses and nurse conduct, supervising residents, and instructing nurses and residents in the evaluation, diagnosis, care and treatment of patients the same as, or similar to Ms. Lenoir Wareing, and for malnutrition, dehydration, decubitus ulcers or pressure sores, infections and sepsis, and their complications.

## FACILITY - PATIENT RELATIONSHIP

Based upon the above facts, there was a facility-patient relationship established between Ms. Lenoir Wareing and The Meadows Health and Rehabilitation Center in Dallas, Texas.

## DUTY

There was a duty owed to Ms. Lenoir Wareing by The Meadows Health and Rehabilitation Center in Dallas, Texas, to do what a reasonable nursing home or rehabilitation center would have done under the same or similar circumstances, or not to do what a reasonable nursing home or rehabilitation center would not have done under the same or similar circumstances.

## RELEVANT STANDARDS OF CARE IN ISSUE

This section addresses some of the principal applicable standards of care that The Meadows Health and Rehabilitation Center in Dallas, Texas and its staff should have met for Ms. Lenoir Wareing, specifically how The Meadows Health and Rehabilitation Center and its staff breached the standards of care and the causal relationship of the breach to Ms. Wareing's injuries, infections and illnesses. These standards are based on my education, training, and direct experience, and are reflected in the state and federal regulations that govern nursing homes and rehabilitation centers.

The following standards, among others, are consistent with the standards of care that were required to be followed by The Meadows Health and Rehabilitation Center and its staff as it concerns Ms. Lenoir Wareing:

1. **TAC Sub chapter J Rule §19.901 (3) Pressure sores.** Based on the comprehensive assessment of the resident, the facility must ensure that: (A) a

8

resident who enters the facility without pressure sores does not develop pressure sores unless his clinical condition demonstrates that they are unavoidable; and (B) a resident having pressure sores receives necessary treatment and services to promote healing, prevent infection, and prevent new sores from developing;

2. **TAC Subchapter J Rule §19.901 (10) Hydration.** The facility must ensure that the resident is provided with sufficient fluid intake to maintain proper hydration and health;

3. **TAC Subchapter J Rule §19.901 (9) Nutrition.** Based on the comprehensive assessment of the resident, the facility must ensure that a resident: (A) maintains acceptable parameters of nutritional status, such as body weight and protein levels, unless his clinical condition demonstrates that this is not possible; and (B) receives a therapeutic diet when there is a nutritional problem;

4. **TAC Subchapter H Rule §19.701.** A facility must care for its residents in a manner and in an environment that promotes maintenance or enhancement of each resident's quality of life. (5) Accommodation of needs. A resident has the right to: (A) reside and receive services in the facility with reasonable accommodation of individual needs and preferences, except when the health or safety of the individual or other residents would be endangered;

5. **TAC Subchapter B Rule §19.101 (81) Neglect** - A deprivation of life's necessities of food, water, or shelter, or a failure of an individual to provide services, treatment, or care to a resident which causes or could cause mental or physical injury, or harm or death to the resident;

6. **TAC Chapter 217 Rule §217.11 Standards of Nursing Practice (1)** Standards Applicable to All Nurses. All vocational nurses, registered nurses and registered nurses with advanced practice authorization shall: (A) Know and conform to the Texas Nursing Practice Act and the Board's rules and regulations as well as all federal, state, or local laws, rules or regulations affecting the nurse's current area of nursing practice;

7. **TAC Chapter 217 Rule §217.11 Standards of Nursing Practice (1)** Standards Applicable to All Nurses. All vocational nurses, registered nurses and registered nurses with advanced practice authorization shall: (C) Know the rationale for and the effects of medications and treatments and shall correctly administer the same;

8. **TAC Chapter 217 Rule §217.11 Standards of Nursing Practice (1)** Standards Applicable to All Nurses. All vocational nurses, registered nurses and registered nurses with advanced practice authorization shall: (F) Promote and

9

participate in education and counseling to a client(s) and, where applicable, the family/significant other(s) based on health needs;

9. TAC Chapter 217 Rule §217.11 Standards of Nursing Practice (1) Standards Applicable to All Nurses. All vocational nurses, registered nurses and registered nurses with advanced practice authorization shall: (G) Obtain instruction and supervision as necessary when implementing nursing procedures or practices;

10. TAC Chapter 217 Rule §217.11 Standards of Nursing Practice (1) Standards Applicable to All Nurses. All vocational nurses, registered nurses and registered nurses with advanced practice authorization shall: (M) Institute appropriate nursing interventions that might be required to stabilize a client's condition and/or prevent complications;

11. TAC Chapter 217 Rule §217.11 Standards of Nursing Practice (1) Standards Applicable to All Nurses. All vocational nurses, registered nurses and registered nurses with advanced practice authorization shall: (T) Accept only those nursing assignments that take into consideration client safety and that are commensurate with the nurse's educational preparation, experience, knowledge, and physical and emotional ability;

12. TAC Chapter 217 Rule §217.11 Standards of Nursing Practice (1) Standards Applicable to All Nurses. All vocational nurses, registered nurses and registered nurses with advanced practice authorization shall: (U) Supervise nursing care provided by others for whom the nurse is professionally responsible;

13. TAC Chapter 217 Rule §217.11 Standards of Nursing Practice (3) Standards Specific to Registered Nurses. The registered nurse shall assist in the determination of healthcare needs of clients and shall: (A) Utilize a systematic approach to provide individualized, goal-directed, nursing care by: (i) performing comprehensive nursing assessments regarding the health status of the client; (ii) making nursing diagnoses that serve as the basis for the strategy of care; (iii) developing a plan of care based on the assessment and nursing diagnosis; (iv) implementing nursing care; and (v) evaluating the client's responses to nursing interventions;

14. TAC Chapter 217 Rule §217.12 Unprofessional Conduct (1) Unsafe Practice – actions or conduct including, but not limited to: (A) Carelessly failing, repeatedly failing, or exhibiting an inability to perform vocational, registered, or advanced practice nursing in conformity with the standards of minimum acceptable level of nursing practice set out in Rule 217.11;

15. TAC Chapter 217 Rule §217.12 Unprofessional Conduct (1) Unsafe Practice

10

– actions or conduct including, but not limited to: (B) Carelessly or repeatedly failing to conform to generally accepted nursing standards in applicable practice settings;

16. **TAC Chapter 217 Rule §217.12 Unprofessional Conduct (4)** Careless or repetitive conduct that may endanger a client's life, health, or safety. Actual injury to a client need not be established;

17. **42 CFR 483.20, 483.25**-The facility must conduct initially a comprehensive, accurate assessment of each resident's functional capacity, a plan of care, based on a resident assessment, which will be used to provide care and services to attain the highest practical physical, mental, and psychosocial well-being;

18. **42 CFR 483.15**- A facility must care for its residents in a manner that promotes quality of life and dignity;

19. **42 CFR 483.30**- The facility must have sufficient nursing staff to provide nursing and related services to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident, as determined by resident assessments and individual plans of care;

20. **42 CFR 483.13, F 224**- "**Neglect**" means failure to provide goods and services necessary to avoid physical harm, mental anguish, or mental illness;

21. **42 CFR 483.10**- The resident has a right to a dignified existence, self-determination, and communication;

22. **42 CFR 483.20 (k) (3) (i)** - The services provided or arranged by the facility must meet professional standards of quality;

23. **42 CFR 483.25(a) (3)** - A resident who is unable to carry out activities of daily living must receive the necessary services to maintain good nutrition...;

24. **42 CFR 483.25(i) (1)** - Based on a resident's comprehensive assessment, the facility must ensure the resident maintains acceptable parameters of nutritional status;

25. **42 CFR 483.25(j)** - The facility must provide a sufficient fluid intake to maintain proper hydration and health;

26. **42 CFR 483.25 (1), (2)**- Ensure a resident entering the facility without pressure sores does not develop them unless the resident's clinical condition demonstrates that they were unavoidable and a resident having pressure sores receives necessary treatment and services to promote healing, prevent infection and prevent new sores from developing; and

11

**27. 42 CFR 483.65-** The facility must establish and maintain an infection control program designed to provide a safe, sanitary, and comfortable environment and to help prevent the development and transmission of disease.

## HOW THE STANDARDS OF CARE WERE BREACHED AND CAUSED INJURY, HARM, OR DAMAGES

### Malnutrition

Ms. Lenoir Wareing is an adult female whose date of birth is XXXXXXXXXXX. In the fall of 2013, Ms. Wareing was 66 years-old and living at home when she suffered a cerebrovascular accident or stroke. After treatment in the hospital, Ms. Wareing was transferred to a nursing home for further treatment and rehabilitation.

On October 29, 2013, Ms. Wareing was admitted to The Meadows Health and Rehabilitation Center in Dallas, Texas (The Meadows), where she remained a resident until May 6, 2014.

The admitting records made by the nursing staff of this facility documented that at the time of admission to this nursing home, Ms. Wareing was alert and oriented to person, place, and time. She was able to express her needs and feed herself. Her hearing and vision were adequate. She was able to move all extremities and feed herself. She was free of contractures, free of infections, well-nourished, well-hydrated, without injuries, and without pain. Her skin examination was negative for pressure sores or infections.

Ms. Lenoir Wareing suffered from malnutrition while a resident in the care of The Meadows due to a failure of this facility to meet her nutritional needs. After her admission to The Meadows Ms. Wareing was documented as being well-nourished as evidenced by normal laboratory testing consisting of a serum albumin level of 4.0 grams per deciliter (g/dl) (normal 3.5 – 5.7 g/dl) and a serum pre-albumin level of 26.9 milligrams per deciliter (mg/dl) (normal 17.0 – 40.0 mg/dl). By the end of her stay at this nursing home, Ms. Wareing's nutritional status had deteriorated as evidenced by abnormally low serum protein levels. At the time Ms. Wareing left The Meadows, she was documented as having a serum albumin level of 2.7 g/dl and a serum pre-albumin level of 11.3 mg/dl.

Ms. Wareing's overall condition continued to worsen due to the negligence she suffered while a resident of The Meadows Health and Rehabilitation Center. She left this nursing home for the final time on May 6, 2014. Following her final discharge from this nursing home, Ms. Wareing was first admitted to the hospital and then a specialty wound care hospital due to the severity of her pressure sores.

She required extensive treatment in these facilities as well as another nursing home to which she was ultimately admitted. Ms. Wareing had to have extensive care and treatment as a result of the illnesses and injuries she developed due to the negligence of The Meadows while she was a resident in their care. She ultimately required prolonged hospitalizations, extensive therapy, surgical procedures, a urinary bladder catheter (Foley catheter), and a percutaneous endoscopically-placed gastrostomy feeding tube (PEG tube).

More likely than not and to a reasonable degree of medical and nursing, probability and certainty, Ms. Wareing will continue to suffer a loss of physical function, as well as other illnesses and complications as a result of the negligence from which she suffered while a resident in the care of The Meadows Health and Rehabilitation Center.

As a direct cause, The Meadows Health and Rehabilitation Center in Dallas, Texas, and its staff failed to comply with those standards set forth in paragraphs: 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, and 24. The failure to comply with these standards caused, within a reasonable degree of medical and nursing, probability and certainty, Ms. Wareing to become malnourished which compounded her ability to fight infections, and compromised her ability to heal her pressure ulcers and further deteriorated her physical function. These problems could have, within a reasonable degree of medical and nursing, probability and certainty, been prevented or detected/addressed earlier if these standards had been followed:

To meet these standards, The Meadows Health and Rehabilitation Center and its staff were required to do the following:

A. Recognize and act on an accurate assessment that Ms. Wareing was at risk for malnutrition as evidenced by her oral intake records, and her deteriorating serum protein blood tests.

B. Act on the fact that Ms. Wareing was totally dependent on staff for both anticipation of needs and physical assistance of all nourishment including foods and fluids.

C. Monitor her oral intake and output each shift, which must be done consistently and accurately for nurses, physicians, and dieticians to evaluate her food and fluid needs and response to medications.

D. Timely notify the physician of changes in signs or symptoms of malnutrition to prevent further complications.

E. Give Ms. Wareing food to eat and water to drink and help her eat and

13

drink.

## Dehydration

The admitting records made by the nursing staff of this facility documented that at the time of admission to this nursing home, Ms. Wareing was alert and oriented to person, place, and time. She was able to express her needs and feed herself. Her hearing and vision were adequate. She was able to move all extremities and feed herself. She was free of contractures, free of infections, well-nourished, well-hydrated, without injuries, and without pain. Her skin examination was negative for pressure sores or infections.

Ms. Lenoir Wareing suffered from dehydration while a resident in the care of The Meadows Health and Rehabilitation Center. This facility failed to provide adequate fluids and hydration to Ms. Wareing while she was a resident of this facility. At the time of her admission to this nursing home, Ms. Wareing was documented as being well-hydrated as evidenced by normal renal function laboratory testing, specifically a normal serum BUN and creatinine level. Ms. Wareing was documented to have a serum BUN of 10 mg/dl (normal 7 – 20 mg/dl) and a serum creatinine level of 0.6 mg/dl (normal 0.6 – 1.2 mg/dl).

During her stay at this nursing home, Ms. Wareing's hydration status deteriorated. At a hospitalization immediately following her discharge from The Meadows, Ms. Wareing had an elevated serum BUN level of 22 mg/dl and an elevated serum creatinine level of 1.27 mg/dl. Ms. Wareing's physician documented in the medical record that this patient's abnormally elevated serum creatinine level was "more than double her baseline creatinine."

Ms. Wareing's overall condition continued to worsen due to the negligence she suffered while a resident of The Meadows Health and Rehabilitation Center. She left this nursing home for the final time on May 6, 2014. Following her final discharge from this nursing home, Ms. Wareing was first admitted to the hospital and then a specialty wound care hospital due to the severity of her pressure sores. She required extensive treatment in these facilities as well as another nursing home to which she was ultimately admitted. Ms. Wareing had to have extensive care and treatment as a result of the illnesses and injuries she developed due to the negligence of The Meadows while she was a resident in their care. She ultimately required prolonged hospitalizations, extensive therapy, surgical procedures, a urinary bladder catheter (Foley catheter), and a percutaneous endoscopically-placed gastrostomy feeding tube (PEG tube).

More likely than not and to a reasonable degree of medical and nursing probability and certainty, Ms. Wareing will continue to suffer a loss of physical function, as well as other illnesses and complications as a result of the negligence

14

from which she suffered while a resident in the care of The Meadows Health and Rehabilitation Center.

As a direct cause, The Meadows Health and Rehabilitation Center in Dallas, Texas, and its staff failed to comply with those standards set forth in paragraph numbers: 2, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, and 25. The failure to comply with these standards caused, within a reasonable degree of medical certainty, Ms. Wareing to become dehydrated, which compounded her ability to fight infection and skin breakdown, and compromised her ability to heal her pressure sores and deteriorated her physical function. These problems could have, within a reasonable degree of medical and nursing, probability and certainty, been prevented or detected/addressed earlier if these standards had been followed:

To meet these standards, The Meadows Health and Rehabilitation Center and its staff were required to do the following:

A. Recognize and act on an accurate assessment that Ms. Wareing was at risk for dehydration as evidenced by her oral intake records and abnormal laboratory testing.

B. Act on the fact that Ms. Wareing was totally dependent on staff for both anticipation of needs and physical assistance of all nourishment including fluids.

C. Monitor her fluid intake and output each shift, which must be done consistently and accurately for nurses, physicians, and dieticians to evaluate her fluid needs and response to medications.

D. Discover and consistently record her urine color, urine odor, and skin turgor, presence of edema, and whether the mucous membranes were moist or dry.

E. Timely notify the physician of changes, specifically weight loss or signs or symptoms of dehydration to prevent further complications.

F. Give Ms. Wareing food to eat and water to drink and help her eat and drink.

### Decubitus Ulcer or Pressure Sore Development

Due to the failure of The Meadows Health and Rehabilitation Center to properly care for Ms. Lenoir Wareing, she developed decubitus ulcers or pressure sores over multiple parts of her body. When this resident first entered this nursing home, she was noted to be free of pressure sores or skin infections of any kind.

15

Due to the failure of this nursing home to employ appropriate measures to prevent pressure sores and decubitus ulcers, Ms. Lenoir Wareing developed multiple decubitus ulcers or pressure sores over different parts of her body, up to stage IV in size, which is the most severe stage. This resident's pressure sores were so severe that following her final discharge from The Meadows, Ms. Wareing required a special wound-care consultation in the hospital for treatment of her pressure sores. She was found to have a large stage IV deep tissue injury or pressure sore over her coccyx, along with a another deep tissue injury or pressure sore on her left foot.

While Ms. Wareing was a resident in the care of The Meadows, the pressure sore over her sacrum was only described as Stage II in size at its worst on April 14, 2014. The pressure sore on Ms. Wareing's foot was never mentioned in the records of The Meadows. On April 25, 2014, the nursing staff of The Meadows stated in the medical record that the pressure sore on Ms. Wareing's sacrum was "healed". It was not mentioned again as recurring in the medical record for the remainder of Ms. Wareing's stay in The Meadows which ended with her discharge on May 6, 2014. On November 5, 2013, the Meadows nursing staff assessed Ms. Wareing as high risk for skin breakdown due to impaired mobility, incontinence, impaired cognition, and a Braden score of 18 or less. On December 12, 2013, Dr. Heather Elaine Adair ordered Ms. Wareing to be placed on a voiding schedule every 2-3 hours during the day. Additionally, the care plan copied this order. and stated that Ms. Wareing should be turned and repositioned every two hours and as needed. During April and May 2014, there are no documentations or flowcharts that show turning and repositioning or an avoiding program. From April 1 thru May 6, 2014, the nursing staff documented only on three shifts (April 8th, 13th, and 16th) that Ms. Wareing was turned and repositioned, and only four times that Ms. Wareing was voiding normally or in her brief. This was inconsistent with earlier entries where Ms. Wareing was assisted to the bathroom every two hours. Urine and excrement are caustic to the skin and prolonged exposure substantially increases the risk of skin break down. Prolonged pressure on boney prominences including the sacrum or coccyx, or bones in the feet, also substantially increases the risk of skin breakdown due to reduced vascular supply. The absence of the standards of care discussed above in The Meadows records demonstrate the direct causation between their failures and the pressure sores that, as a result developed on Ms. Wareing. Had the Meadows nursing staff followed the required standards above and the physician order for care, Ms. Wareing would more likely than not have remained free of pressure sores.

Ms. Wareing's overall condition continued to worsen due to the negligence she suffered while a resident of The Meadows Health and Rehabilitation Center. She left this nursing home for the final time on May 6, 2014. Following her final discharge from this nursing home, Ms. Wareing was first admitted to the hospital and then a specialty wound care hospital due to the severity of her pressure sores. She required extensive treatment in these facilities as well as another nursing home to which she was ultimately admitted. Ms. Wareing had to have extensive care and

16

treatment as a result of the illnesses and injuries she developed due to the negligence of The Meadows while she was a resident in their care. She ultimately required prolonged hospitalizations, extensive therapy, surgical procedures, a urinary bladder catheter (Foley catheter), and a percutaneous endoscopically-placed gastrostomy feeding tube (PEG tube).

More likely than not and to a reasonable degree of medical and nursing, probability and certainty, Ms. Wareing will continue to suffer a loss of physical function, as well as other illnesses and complications as a result of the negligence from which she suffered while a resident in the care of The Meadows Health and Rehabilitation Center.

As a direct cause, The Meadows Health and Rehabilitation Center in Dallas, Texas, and its staff failed to comply with those standards set forth in paragraphs: 1, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, and 26. The failure to comply with these standards caused, within a reasonable degree of medical and nursing, probability and certainty, Ms. Wareing to develop and suffer from skin breakdown. These problems could have, within a reasonable degree of medical and nursing, probability and certainty, been prevented or detected/addressed earlier if these standards had been followed.

To meet these standards, The Meadows Health and Rehabilitation Center and its staff were required to do the following:

A. Recognize by an accurate and complete assessment that Ms. Wareing was in fact at risk for skin breakdown which was related to her dependence on staff, poor oral intake, lack of mobility, and provide and document the indicated preventive and protective measures to avoid further breakdown.

B. Provide and document the indicated preventive and protective measures to avoid further breakdown.

C. Timely recognize, document, and report any changes in skin integrity. Provide treatment as ordered by the physician to the indicated area as outlined in the Plan of Care.

D. The Meadows Health and Rehabilitation Center, its nurses and all staff members who contribute to patient medical records should record and maintain accurate medical records that appropriately and accurately describe the precise medical condition of a patient and the actions taken by the nursing home staff.

E. All staff members of The Meadows Health and Rehabilitation Center who contribute to patient medical records should promptly note abnormal findings in a patient's medical record in order that the patient's physician

17

and others can address a patient's needs in a timely manner.

F. Keep Ms. Wareing clean, dry, turned/repositioned, nourished, hydrated, and free from skin breakdown

## Development of Infections and Sepsis

The Meadows Health and Rehabilitation Center failed to prevent and properly treat the infections of Ms. Lenoir Wareing's urinary tract on multiple occasions. These localized infections caused, more likely than not, Ms. Wareing to develop sepsis, or a generalized infection of her bloodstream at least twice. Ms. Wareing's urinary tract infections and sepsis developed and became severe while a resident in the care of The Meadows. These infections required her to be hospitalized at least twice, once beginning February 1, 2014 and again immediately following her final discharge from the Meadows on May 6, 2014.

Ms. Wareing's overall condition continued to worsen due to the negligence she suffered while a resident of The Meadows Health and Rehabilitation Center. She left this nursing home for the final time on May 6, 2014. Following her final discharge from this nursing home, Ms. Wareing was first admitted to the hospital and then a specialty wound care hospital due to the severity of her pressure sores. She required extensive treatment in these facilities as well as another nursing home to which she was ultimately admitted. Ms. Wareing had to have extensive care and treatment as a result of the illnesses and injuries she developed due to the negligence of The Meadows while she was a resident in their care. She ultimately required extensive therapy, surgical procedures, a urinary bladder catheter (Foley catheter), and a percutaneous endoscopically-placed gastrostomy feeding tube (PEG tube).

More likely than not and to a reasonable degree of medical and nursing, probability and certainty, Ms. Wareing will continue to suffer a loss of physical function, as well as other illnesses and complications as a result of the negligence from which she suffered while a resident in the care of The Meadows Health and Rehabilitation Center.

As a direct cause, The Meadows Health and Rehabilitation Center in Dallas, Texas, and its staff failed to comply with those standards set forth in paragraphs: 4, 5, 6, 7, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, and 27. The failure to comply with these standards caused, within a reasonable degree of medical and nursing, probability and certainty, Ms. Wareing to develop infections, which compromised her overall health and well-being. These problems could have, within a reasonable degree of medical and nursing, probability and certainty, been prevented or detected/addressed earlier and cured if these standards had been followed.

18

To meet the standards, The Meadows Health and Rehabilitation Center and its staff were required to do among other things the following:

A. Recognize, plan for, and act on accurate assessments that Ms. Wareing had a history of infections, was at risk for future infections related to a poor nutritional intake, dependence on staff for assistance with intake, and poor mobility.

B. Develop and act on a plan of care to minimize the risk for developing infections.

C. Monitor her fluid intake and output each shift, which must be done consistently and accurately for nurses, physicians, and dieticians to evaluate her fluid needs for prevention of complications such as infections.

D. Use proper hygiene and sanitary technique.

### SUMMARY

I have been advised that "*Negligence*" means:

*Negligence, when used with respect to the conduct of a medical facility means failure to use ordinary care, that is, failing to do that which a medical facility of ordinary prudence would have done under the same or similar circumstances or doing that which a medical facility of ordinary prudence would not have done under the same or similar circumstances.*

I have been advised "*proximate cause*" means:

*That cause which, in a natural and continuous sequence, produces an event, and without cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a health care facility, using ordinary care, would have foreseen that the event or some similar event might reasonably result there from. There may be more than one proximate cause of an event.*

Ms. Lenoir Wareing was an adult female, who had been living independently at home prior to her hospitalization for stroke which immediately preceded her admission to The Meadows Health and Rehabilitation Center in Dallas, Texas. She entered this nursing facility primarily to receive minimal assistance with activities of daily living. At the time of admission she was documented as being free from skin wounds, pressure sores, decubitus ulcers or skin infections of any kind. Ms.

19

Wareing was alert and oriented to person, place, and time, and her hearing and vision were adequate. She was able to express her needs and feed herself. Her underlying condition of diabetes was controlled with medication, and had no contribution in Ms. Wareing developing pressure sores. The admitting medical records from The Meadows Health and Rehabilitation Center document that Ms. Wareing had no medical conditions that would have caused her unavoidably to develop and suffer from malnutrition, dehydration, decubitus ulcers or pressure sores, infections or sepsis. She had no history of any medical condition that would have significantly compromised her vascular system, or made her excessively prone to develop the conditions listed above.

More likely than not, this failure on the part of The Meadows Health and Rehabilitation Center in Dallas, Texas, to practice in an acceptable manner directly resulted in Ms. Lenoir Wareing's malnutrition, dehydration, decubitus ulcers or pressure sores, infections and sepsis, injuries, illnesses and their complications, prolonged hospitalizations, extensive therapy, surgical procedures, a urinary bladder catheter (Foley catheter), and a percutaneous endoscopically-placed gastrostomy feeding tube (PEG tube), as well as overall worsening of her condition, unnecessary and preventable pain, mental anguish, and loss of dignity. As more specifically set forth above, the actions or inactions of this facility, caused the conditions and complications described above.

In summary, The Meadows Health and Rehabilitation Center in Dallas, Texas, did not meet the standard of care in its treatment of Ms. Lenoir Wareing. It is my opinion, based on my medical education, experience, and training and based upon a reasonable degree of medical and nursing, probability and certainty that these negligent acts and omissions as stated above proximately caused Ms. Wareing's malnutrition, dehydration, decubitus ulcers or pressure sores, infections and sepsis, injuries, illnesses, and their complications, prolonged hospitalizations, extensive therapy, surgical procedures, a urinary bladder catheter (Foley catheter), and a percutaneous endoscopically-placed gastrostomy feeding tube (PEG tube), overall worsening of her condition, as well as unnecessary and preventable pain, suffering, mental anguish, and loss of dignity. It is my opinion that The Meadows Health and Rehabilitation Center in Dallas, Texas, knew that its failure to meet the standards of care would put Ms. Wareing at extreme risk of harm and knew that this failure to meet these standards would likely cause complications or injuries to Ms. Wareing. Nevertheless, The Meadows Health and Rehabilitation Center still failed to follow the above standards. Had the standards of care been followed by The Meadows Health and Rehabilitation Center, more likely than not and based upon a reasonable degree of medical and nursing, probability and certainty, Ms. Lenoir Wareing would not have suffered the malnutrition, dehydration, decubitus ulcers or pressure sores, infections and sepsis, injuries, illnesses, prolonged hospitalizations, extensive therapy, surgical procedures, a urinary bladder catheter (Foley catheter), and a percutaneous endoscopically-placed gastrostomy feeding tube (PEG tube), along with their complications, as well as overall worsening of her condition, unnecessary

20

and preventable pain, suffering, mental anguish, and loss of dignity.

      I reserve the right to amend or add to my opinions upon review of new records, testimony, or facts, as they become available, or upon further review of existing records, testimony or facts.

                            Respectfully submitted,

                            Keith E. Miller, M.D.
                            620 Tenaha Street
                            Center, Texas   75935

21

# CURRICULUM VITAE

**KEITH E. MILLER, M.D.**

620 Tenaha Street

Center, Texas   75935

(936) 598-2716

# KEITH E. MILLER, M.D.

## - EDUCATION -

Chief Resident, 7/87 to 6/88
University of Arkansas Medical Sciences Campus
Area Health Education Center, South Arkansas
El Dorado, Arkansas

Family Practice Residency, 7/86 to 6/88
University of Arkansas Medical Sciences Campus
Area Health Education Center, South Arkansas
El Dorado, Arkansas

Family Practice Internship, 7/85 to 6/86
University Hospital
Little Rock, Arkansas

Doctor of Medicine Degree, 8/81 to 5/85
University of Arkansas College of Medicine
Little Rock, Arkansas

Attended, 8/80 to 5/81
University of Arkansas at Little Rock, School of Law
Little Rock, Arkansas

Bachelor of Arts, 8/76 to 5/79
German and Chemistry
Baylor of University
Waco, Texas

Attended, 8/75 to 5/76
Biology and Chemistry
East Texas Baptist College
Marshall, Texas

Shelbyville High School, 8/71 to 5/75
Shelbyville, Texas

2

# KEITH E. MILLER, M.D.

## -PRACTICE ACTIVITIES-

Full Time Family Medicine Practice, July 1988 to Present

Commissioner, 9/03 to 9/07
Texas State Board of Medical Examiners / Texas Medical Board
State Medical Licensing Board of Texas

Physician Consultant for Physician Peer Review, 8/90 to 9/03
Texas State Board of Medical Examiners
State Medical Licensing Board of Texas

Member, Texas Statewide Medical Advisory Committee, 8/95 to Present
Blue Cross/Blue Shield of Texas
Performs Physician Peer Review for All Blue Cross/Blue Shield Patients in Texas

President, 1990 to Present
Shelby County Medical Society

Advisory Committee Member and Clinical Faculty, 8/90 to Present
School of Licensed Vocational Nursing
Panola College
Center, Texas

Member, Board of Directors, and Medical Director, 8/90 to Present
Shelby County Child Advocacy Center
Center, Texas

2014 to Present
Family Medicine Service Privileges
Memorial Hospital San Augustine
San Augustine, Texas

2014 to Present
Family Medicine Service Privileges
Nacogdoches Medical Center
Nacogdoches, Texas

# KEITH E. MILLER, M.D.

## -PRACTICE ACTIVITIES (CONTINUED)-

Former Physician Reviewer, Texas Medical Foundation, 8/90 to 8/03
Performs Physician Peer Review/Quality Assurance for Medicare and Champus

Former Clinical Faculty, Preceptor, 8/90 to 8/03
University of Texas Health Sciences Center
Family Practice Residency Program
Tyler, Texas

Former Director of Emergency Services, 8/90 to 8/03
Shelby Regional Medical Center
Center, Texas

Former Chief of Staff
Shelby Regional Medical Center
Center, Texas

July 1988 to 2013
Full Time Active Family Practice Privileges
Shelby Regional Medical Center
Center, Texas

September 2010 to Present
Medical Director
Legacy Hospice of Center
Center, Texas

March 2011 to Present
Assistant Medical Director
The Hospice of East Texas
Tyler, Texas

July 1988 to Present
Full Time Active Family Practice Privileges
Holiday Nursing Home
Center, Texas

4

# KEITH E. MILLER, M.D.

## -PRACTICE ACTIVITIES (CONTINUED)-

July 1988 to Present
Full Time Active Family Practice Privileges
Pine Grove Nursing Home
Center, Texas

July 1988 to Present
Full Time Active Family Practice Privileges
Green Acres Nursing Home
Center, Texas

July 1988 to Present
Full Time Active Family Practice Privileges
Twin Lakes Nursing Home
San Augustine, Texas

July 1988 to Present
Full Time Active Family Practice Privileges
Colonial Pines Nursing Home
San Augustine, Texas

July 1988 to Present
Full Time Active Family Practice Privileges
Trinity Nursing and Rehabilitation Center
San Augustine, Texas

July 1988 to Present
Full Time Active Family Practice Privileges
El Camino House Nursing Home
San Augustine, Texas

December 2013 to Present
Full Time Active Family Practice Privileges
Lakeside Village Assisted Living
Center, Texas

5

# KEITH E. MILLER, M.D.

## -PRACTICE ACTIVITIES (CONTINUED)-

March 2012 to Present
Medical Director
Bethany Home Health Care Agency
Carthage, Texas

January 2014 to Present
Medical Director
Jennings Place
Assisted Living Facility and
Home and Community-Based Services Program for Adults with Mental Disabilities
Center, Texas

## - BOARD CERTIFICATIONS -

American Board of Family Medicine, ID 53861

Certification Date July 8, 1988

Re-Certification Date July 14, 1995

Re-Certification Date July 12, 2002

Re-Certification Date July 15, 2010

6

# KEITH E. MILLER, M.D.

## - PROFESSIONAL CERTIFICATIONS -

Hospice Medical Director Certified (HMDC)
Hospice Medical Director Certification Board
July 8, 2014 to Present

Certified Medical Review Officer
Medical Review Officer Certification Council
United States Department of Transportation
United States Department of Health and Human Services
Certified February 21, 2006
Re-certified March 24, 2012

Certified Medical Examiner
Federal Motor Carrier Safety Administration
United States Department of Transportation
United States Department of Health and Human Services
Certified February 11, 2014

Fellow (AAFP), 1990 to Present
American Academy of Family Physicians

American Heart Association
CPR Instructor
Advanced Cardiac Life Support Instructor
Pediatric Advanced Life Support Provider

## - PROFESSIONAL AFFILIATIONS -

American Medical Association

Southern Medical Association

American Academy of Family Physicians

Texas Medical Association

Shelby County Medical Society

7

# KEITH E. MILLER, M.D.

## - VOLUNTEER ACTIVITIES -

Texas State Legislature
Physician of the Day, 1989 to Present

Coordinator, Free Physicals Programs, 1988 to Present
Department of Athletics
Center Independent School District, Center, Texas

Team Physician, 1988 to Present
Department of Athletics
Center Independent School District

Vice-President, Board of Trustees, 1990 to 1999
Center Independent School District, Center, Texas

Preceptor, 1990 to Present
Texas Statewide Medical Student Preceptorship Program

Member, Development Council
Baylor University

Former Member, Committee on Rural Health Concerns
Texas Medical Association

Former Member, Committee on Rural Health
Texas Academy of Family Physicians

## -LICENSURE-

State of Texas (H-2155), 8/87 to Present

Formerly Licensed in Arkansas and Louisiana

8

# KEITH E. MILLER, M.D.

## - AWARDS -

Texas Academy of Physician Assistants
Supervising Physician of the Year - 2004

American Medical Association
Physician's Recognition Award

American Academy of Family Physicians
Award for Clinical Instruction of Medical Students

Center Independent School District
Community Service Award for Contributions to
Student Academics and Athletics

Anderson County Educational Cooperative
Service Award for Organizing Programs for
Special Services Students

Texas State Legislature
Award of Appreciation for Serving as
Physician to Legislators While in Session

## - PUBLICATIONS -

"Use of Digoxin in the Family Practice Setting"
*Journal of the Arkansas Medical Society*
February 1988

9

# KEITH E. MILLER, M.D.

## - ARTICLES -

"More Doctors in Texas After Malpractice Caps"
*New York Times*
October 5, 2007
Story of Texas Medical Board Responding to Increased Licensing
Demands During My Tenure as Chairman of the Licensing Committee

"Dangerous Doctors"
*Reader's Digest*
June 2004
Background Story of Texas Medical Board Prior to My
Appointment as a Commissioner

"Dangerous Doctors – Follow-Up"
*Reader's Digest*
March 2005
Follow-up Story of Texas Medical Board After My
Appointment as a Commissioner Including Motion Made by Me for the Largest Fine
Levied Against a Doctor by any State in History

"No Medicinal Jet Fuel"
*Texas Medicine*
August 2009
Story of My Filing of Complaint Against a Physician for Non-Therapeutic Prescribing

## - PERSONAL -

Married to Linda Gee Miller since 1975

Interests Are Health-Care Reform and Finance Issues, in America and Abroad

Speaks Fluent German and Passable Spanish

Instrument-Rated Private Aircraft Pilot

Umpire, High School Baseball

10